> Attach Label

Stent Implant Card
CYPHER® Sirolimus-eluting Coronary Stent

**Cordis®**
a Johnson-Johnson company

Cordis Corporation, P.O. Box 025700
Miami, FL 33102-5700
1-800-781-0282
For more information, please visit our website
www.CYPHERUSA.com

> Attach Label



**Cordis®**
a Johnson-Johnson company

*Ground breaking, Life changing®*



**INSTRUCTIONS:** *Please carry this card at all times and show it to any medical personnel who may be treating you.*

Patient Name:

Date of Implant:

Site of Implant:

Implanting Physician:

Hospital:

Address:

Telephone #:

Primary Physician:

Telephone #:

Magnetic Resonance Imaging (MRI) of single or two overlapping CYPHER® Sirolimus-eluting Coronary Stents has been shown to be safe in MRI units with a magnetic strength of 3 Tesla or less. Notify your doctor before you have an MRI scan.

Your cardiologist has prescribed a number of antiplatelet (AP) medications. It is extremely important to follow the medication regimen as prescribed by your cardiologist. Before considering any surgery or dental work which would require you to stop taking AP medicines early, you and your doctor should consider the risks from early discontinuation of these medications. For questions regarding your CYPHER Stent or procedure, please contact your implanting cardiologist or Cordis Corporation at 1-800-781-9282.          10130073-2



**Cordis.**

a ‹johnson‹johnson company

*Ground breaking, life changing*

Cardiology

Cordis Corporation
PO Box 025700
Miami, FL 33102
USA
For Customer Service
call 1 800 327 7714

For more patient information,
please visit **www.CYPHERUSA.com**

Sirolimus-eluting Stent made by Cordis Corporation pursuant
to a license from Wyeth Pharmaceuticals

© Cordis Corporation 2008       January 2008                    155-0786-4

# A1416-2302

# REDACTED

1

UNITED STATES OF AMERICA

+ + + + +

FOOD AND DRUG ADMINISTRATION

+ + + + +

CIRCULATORY SYSTEM DEVICES ADVISORY PANEL

+ + + + +

MEETING

+ + + + +

THURSDAY,
NOVEMBER 29, 2007

+ + + + +

The meeting convened at 8:00 a.m. at the Gaithersburg Holiday Inn, 2 Montgomery Village Avenue, Gaithersburg, Maryland, CLYDE W. YANCY, M.D., Acting Panel Chairperson, presiding.

PANEL MEMBERS PRESENT:

CLYDE YANCY, M.D, Acting Chairperson
RICHARD L. PAGE, M.D., Voting Member
JOHN C. SOMBERG, M.D., Voting Member
EUGENE H. BLACKSTONE, M.D., Consultant
JEFFREY A. BRINKER, M.D., Consultant
JOHN W. HIRSHFELD, M.D., Consultant
VALLUVAN JEEVANANDAM, M.D., Consultant
NORMAN S. KATO, M.D., Consultant
WARREN K. LASKEY, M.D., Consultant
DOUGLAS MORRISON, M.D., Consultant
SHARON-LISE NORMAND, Ph.D., Consultant
MARCIA S. YAROSS, Ph.D., Industry
   Representative
KAREN R. RUE, Consumer Representative

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

CORD114692

A2303

2

FDA PARTICIPANTS:

JAMES P. SWINK, Panel Executive Secretary
BRAM ZUCKERMAN, M.D., Director, Division of
    Cardiovascular Devices
HEATHER L. AGLER, Ph.D., Division of
    Cardiovascular Devices
ASHLEY BOAM, Branch Chief, Interventional
    Cardiology Devices, Office of Device
    Evaluation
DANICA MARINAC-DABIC, M.D., Ph.D., Chief,
    Epidemiology Branch, Office of Surveillance
    and Biometrics
HESHA DUGGIRALA, Ph.D., Office of Surveillance
    and Biometrics
ROBERT P. FIORENTINO, M.D., M.P.H., Division
    of Cardiovascular Devices
XU YAN, Ph.D., Office of Surveillance and
    Biometrics

SPONSOR PARTICIPANTS:
LESLIE COLEMAN, D.V.M., M.S., DACLAM,
    Director, Preclinical Research, Abbott
    Vascular
PETER FITZGERALD, M.D., Ph.D., Stanford
    University
GARY C. JOHNSON, Vice President, Regulatory
    Affairs, Clinical Research, and Quality
    Assurance, Abbott Vascular
MITCHELL W. KRUCOFF, M.D., Professor of
    Medicine/Cardiology, Duke University Medical
    Center, Director, Cardiovascular Devices
    Unit, Duke Clinical Research Institute
STUART POCOCK, Ph.D., Professor of Medical
    Statistics, London School of Hygiene and
    Tropical Medicine
MURTHY SIMHAMBHATLA, Ph.D., Vice President and
    General Manager, DES, Abbott Vascular
GREGG W. STONE, M.D., Professor of Medicine,
    Columbia University Medical Center, The
    Cardiovascular Research Foundation
KRISHNA SUDHIR, M.D., Ph.D., Director, Abbott
    Vascular
ROSEANN WHITE, Abbott Vascular

CORD114693

A2304

3

TABLE OF CONTENTS

AGENDA ITEM                                    PAGE

Call to Order............................4
Conflict of Interest and Deputization.......5
   to Voting Member Status Statements
Panel Introductions......................14

Post-Approval Studies Update..............16

1st Open Public Hearing...................32

Sponsor Presentation.....................34

Sponsor Q&A.............................140

FDA Presentation........................188

Panel Deliberations and FDA Questions.....257

2nd Open Public Hearing..................492

2nd Sponsor Presentation.................492

FDA and Sponsor Summations...............497

Panel Vote..............................507

Adjourn

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

CORD114694

A2305

4

1           P-R-O-C-E-E-D-I-N-G-S

2                              (8:02 a.m.)

3           CALL TO ORDER

4           CHAIRPERSON YANCY:   Good morning.

5   My name is Clyde Yancy.  I am Medical Director

6   of the Baylor Heart and Vascular Institute at

7   Baylor University Medical Center in Dallas and

8   Chairperson of today's panel deliberations.  I

9   would  like  to  call  this  meeting  of  the

10  Circulatory System Devices Panel to order.

11          If  you  haven't  already  done  so,

12  please sign the attendance sheets that are on

13  the  tables  by  the  doors.   If  you  wish  to

14  address  this  panel  during  one  of  the  open

15  sessions, please provide your name to Ms. Anne

16  Marie  Williams  at  the  registration  table.   If

17  you  are  presenting  in  any  of  the  open  public

18  sessions   today   and   have   not   previously

19  provided   an   electronic   copy   of   your

20  presentation to FDA, please arrange to do so

21  with Ms. Williams.

22          I  note  for  the  record  that  the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

CORD114695

A2306

5

1    voting members present constitute a quorum, as

2    required by 21 CFR Part 14.  I would also like

3    to add that the panel participating in the

4    meeting today has received training in FDA

5    device law and regulations.  If you have

6    electronic pagers, PDAs, or cell phones,

7    please place them on a silent mode so that

8    they will be minimally intrusive.

9           Mr. Swink, the Executive Secretary

10   for the Circulatory System Devices Panel, will

11   make some introductory remarks.

12       CONFLICT OF INTEREST AND DEPUTIZATION TO

13          VOTING MEMBER STATUS STATEMENTS

14           EXECUTIVE SECRETARY SWINK:   I'll

15   now read the conflict of interest statement.

16   "The Food and Drug Administration is convening

17   today's meeting of the Circulatory System

18   Devices Panel of the Medical Devices Advisory

19   Committee under the authority of the Federal

20   Advisory Committee Act of 1972.

21           "With the exception of the industry

22   representative, all members and consultants of

CORD114696

A2307

6

1　the panel are special government employees or

2　regular federal employees from other agencies

3　and are subject to federal conflict of

4　interest laws and regulations.

5　　　　"The following information on the

6　status of this panel's compliance with federal

7　ethics and conflict of interest laws covered

8　by, but not limited to, those found at 18 USC,

9　section 208, and section 712 of the Federal

10　Food, Drug, and Cosmetic Act are being

11　provided to today's participants and to the

12　public.

13　　　　"FDA has determined that members

14　and consultants of this panel are in

15　compliance with federal ethics and conflict of

16　interest laws.  Under 18 USC, section 208,

17　Congress has authorized FDA to grant waivers

18　to special government employees who have

19　potential financial conflicts when it is

20　determined that the agency's need for that

21　particular individual's services outweighs his

22　or her potential financial conflict of

CORD114697

A2308

7

1    interest.

2            "Under section 712 of the FD&C Act,

3    Congress has authorized FDA to grant waivers

4    to special government employees and regular

5    government employees with potential financial

6    conflicts when necessary to afford the

7    committee essential expertise.

8            "Related to the discussion of

9    today's meetings, members and consultants of

10   this panel who are special government

11   employees have been screened for potential

12   financial conflicts of interest of their own

13   as well as those imputed to them, including

14   those of their spouses or minor children and

15   for purposes of 18 USC, section 208, their

16   employers. These interests may include

17   investments, consulting, expert witness

18   testimony, contracts, grants, CRADAs,

19   teaching, speaking, writing, patents, and

20   royalties, and primary employment.

21           "Today's agenda involves the

22   discussion of a pre-market approval

CORD114698

A2309

8

1  application for the XIENCE V

2  Everolimus-Eluting Coronary Stent System

3  sponsored by Abbott Vascular, a subsidiary of

4  Abbott Laboratories.

5  "The system is indicated for

6  improving coronary lumenal diameter in

7  patients with symptomatic heart disease due to

8  de novo native coronary artery lesions with a

9  length of equal to 28 millimeters with

10  reference vessel diameter of 2.5 to 4.25

11  millimeters.

12  "This is a particular matters

13  meeting, during which specific matters related

14  to the PMA will be discussed. Based on the

15  agenda for today's meeting and all financial

16  interest reported by the panel members and

17  consultants, conflict of interest waivers have

18  been issued in accordance with 18 USC, section

19  208(b)(3) to Drs. Jeffrey Brinker, John

20  Somberg, and Clyde Yancy. A waiver has also

21  been issued in accordance with section 712 of

22  the FD&C Act for Dr. Yancy.

CORD114699

A2310

1          "Dr. Brinker's waiver involves his

2     employer's interest in a sponsor study.  His

3     institute received less than $100,000 in

4     funding.   Dr. Brinker has no personal

5     involvement in the study.

6          "Dr. Somberg's waiver entails his

7     employer's interest in the sponsor's study.

8     His institute received less than $100,000 in

9     funding.   Dr. Somberg has no personal

10    involvement in the study.

11         "Dr. Yancy's waivers address

12    personal consulting arrangements with a

13    competing firm to the sponsor and an

14    unaffected unit of the parent or of the

15    competing firms.  He receives an annual fee of

16    less than $10,001 for these arrangements,

17    which are unrelated to today's agenda.

18         "The waivers allow these

19    individuals to participate fully in today's

20    deliberations.   FDA's reasons for issuing the

21    waivers are described in waiver documents,

22    which are posted on FDA's Web site at

CORD114700

A2311

10

1    www.fda.gov.

2           "Copies of the waivers may also be

3    obtained by submitting a written request to

4    the agency's Freedom of Information Office,

5    which is in room 6-30 of the Parklawn

6    Building.

7           "A copy of this statement will be

8    available for review at the registration table

9    during this meeting and will be included as a

10   part of the official transcript.

11          "Marcia S. Yaross, Ph.D., is

12   serving as the industry representative, acting

13   on behalf of all related industry, and

14   employed by Biosense Webster, Incorporated, a

15   Johnson and Johnson company.

16          "We would like to remind members

17   and consultants that if the discussions

18   involve any other products or firms not

19   already on the agenda for which the FDA

20   participant has a personal or imputed

21   financial interest, the participants need to

22   exclude themselves from such involvement.  And

CORD114701

A2312

11

1   their exclusion will be noted for the record.

2            "FDA   encourages   all   other

3   participants  to  advise  the  panel  of  any

4   financial relationships that they may have

5   with any firms at issue." Thank you.

6            I will now read the employment to

7   temporary  voting  status.  "Pursuant  to  the

8   authority granted under the Medical Devices

9   Advisory Committee charter of the Center for

10  Devices and Radiological Health dated October

11  27th, 1990 and as amended August 18th, 2006, I

12  appoint  the  following  individuals  as  voting

13  members  of  the  Circulatory  System  Devices

14  Panel  for  the  duration  of  this  meeting  on

15  November  29,  2007:   John  W.  Hirshfeld,

16  Valluvan  Jeevanandam,  Norman  S.  Kato,  Warren

17  K.  Laskey,  Douglas  A.  Morrison,  Sharon-Lise

18  Normand,  Jeffrey  A.  Brinker,  and  Eugene  H.

19  Blackstone.

20           "For the record, these individuals

21  are  special  government  employees  and/or

22  consultants  to  the  panel  under  the  Medical

CORD114702

A2313

12

1    Devices   Advisory   Committee.   They   have

2    undergone the customary conflict of interest

3    review and have reviewed the material to be

4    considered at this meeting.   In addition, I

5    appoint  Clyde  W.  Yancy,  M.D.,  to  act  as

6    temporary chairperson for the duration of this

7    meeting."

8              This   was   signed   by   Daniel   G.

9    Schultz, Director for the Center for Devices

10   and  Radiological  Health,  and  dated  November

11   16th, 2007.

12              A  few  more  general  announcements.

13   Transcripts   of   today's   meeting   will   be

14   available   from   Neal   Gross   and   Company.

15   Information  on  purchasing  these  videos  of

16   today's  meeting  can  be  found  on  a  table

17   outside of the meeting room.

18              Presenters  to  the  panel  who  have

19   not already done so should provide FDA with a

20   hard   copy   of   their   remarks,   including

21   overheads.   I would like to remind everyone

22   that members of the public and the press are

CORD114703

A2314

13

1  not permitted around the panel area beyond the

2  speakers' podium and are not permitted to talk

3  with the consultants.

4          The press contact for today's

5  meetings are Karen Riley and Peper Long. And

6  I request that reporters wait to speak with

7  FDA officials until after the panel meeting.

8          Thank you.

9          CHAIRPERSON YANCY:   Good morning

10  again.  At this meeting, the panel will be

11  making a recommendation to the Food and Drug

12  Administration  on  the  pre-market  approval

13  application,  PMA,  P070015  for  the  Abbott

14  Vascular XIENCE V Everolimus-Eluting Coronary

15  Stent System.

16          The XIENCE Coronary Stent System is

17  indicated  for  improving  coronary  lumenal

18  diameter  in  patients  with  symptomatic  heart

19  disease due to de novo native coronary artery

20  lesions less than or equal to 28 millimeters

21  with reference vessel diameter of 2.5 to 4.25

22  millimeters.

CORD114704

A2315

14

PANEL INTRODUCTIONS

CHAIRPERSON YANCY:  Before we begin deliberations on this PMA under the auspices of that proposed indication that we just read, I would like to ask our panel members, who have generously given their time today, and other FDA staff seated at this table to introduce themselves.

We will start with Dr. Zuckerman. Please state your name, your area of expertise, your position, and affiliation. Thank you.

DR. ZUCKERMAN:  Good morning.  Bram Zuckerman, Director, FDA Division of Cardiovascular Devices.

MEMBER BRINKER:  Hi.  Jeff Brinker, interventional Cardiologist, professor of medicine and radiology, Johns Hopkins University.

MEMBER HIRSHFELD:  I'm John Hirshfeld.  I'm an interventional cardiologist at the University of Pennsylvania.

CORD114705

A2316

15

1          MEMBER   KATO:      Norman   Kato,

2     cardiothoracic  surgery,  private  practice,  Los

3     Angeles, California.

4          MEMBER NORMAND:  Hi.  Sharon-Lise

5     Normand, professor of health care policy and

6     biostatistics,  Harvard  Medical  School  and

7     Harvard School of Public Health.

8          MEMBER SOMBERG:  Hi.  John Somberg,

9     professor of medicine and pharmacology, Rush

10    University, Chicago, Illinois.

11         EXECUTIVE  SECRETARY  SWINK:   James

12    Swink, Executive Secretary.

13         MEMBER LASKEY:  Warren Laskey.  I'm

14    Chief of Cardiology at the University of New

15    Mexico.

16         MEMBER   PAGE:      Rick   Page,

17    cardiologist, electrophysiologist.  I'm head

18    of cardiology at the University of Washington

19    in Seattle.

20         MEMBER   BLACKSTONE:      Eugene

21    Blackstone, full-time clinical research, head

22    clinical  research,  Department  of  Thoracic

CORD114706

A2317

1   Cardiovascular Surgery at Cleveland Clinic.

2               MEMBER   JEEVANANDAM:    Valluvan

3   Jeevanandam.  I'm the Chief of Cardiothoracic

4   Surgery at the University of Chicago.

5               MEMBER MORRISON:   Good   morning.

6   I'm  Doug  Morrison.   I'm  an  interventional

7   cardiologist in private practice.

8               MEMBER YAROSS:  Marcia Yaross, Vice

9   President,  Clinical  Quality,  Regulatory,  and

10  Health  Policy  at  Biosense  Webster  in  Diamond

11  Bar,  California  and  industry  representative  to

12  this panel.

13              MEMBER   RUE:    Karen   Rue   with

14  Griswold  Special  Care.   I'm  from  Lafayette,

15  Louisiana.  And I'm consumer representative.

16              CHAIRPERSON YANCY:  Thank you.

17          We  will  now  proceed  with  a  brief

18  post-approval studies update from the FDA.

19          POST-APPROVAL STUDIES UPDATE

20          DR.  MARINAC-DABIC:   Good  morning,

21  ladies  and  gentlemen,  Mr.  Chairman,  Dr.

22  Zuckerman, distinguished members of the panel.

CORD114707

A2318

17

1     My name is Danica Marinac-Dabic.  I am the

2     Chief of Epidemiology Branch at the Office of

3     Surveillance and Biometrics.  And this is the

4     unit that is in charge of the review and

5     oversight of the post-approval studies

6     program.

7            During the past couple of years,

8     the CDRH has made significant commitment of

9     resources to enhance the post-approval studies

10    program, with the major goals to enhance

11    scientific vigor of post-approval studies,

12    establish and maintain accountability for the

13    post-approval study commitments, build

14    post-approval study information management

15    system, build bridges between the

16    post-approval studies knowledge, and

17    pre-market device evaluation, and also to

18    increase the transparency with the public.

19           Today I would like to give you, our

20    expert advisory panel, an update on the most

21    recent developments in the CDRH post-approval

22    studies program followed by a brief overview

CORD114708

A2319

18

1  of the current status of the ongoing

2  cardiovascular post-approval studies.

3          The new CDRH post-approval studies

4  program encompasses design, tracking,

5  oversight, and review responsibilities for the

6  studies mandated as a condition of approval.

7  The program helps ensure that well-designed

8  post-approval studies are conducted

9  effectively, efficiently, and in the least

10  burdensome manner.

11          During the last several years, CDRH

12  fundamentally changed the processes by which

13  we handle post-approval studies.   The main

14  changes had occurred in the oversight,

15  tracking, and review of post-approval studies.

16          We also issued the guidance

17  document to the FDA staff and the sponsors of

18  medical devices.   We also developed and

19  released the post-approval studies Web page

20  and initiated post-market updates to the

21  panel.   And, finally, we developed a

22  comprehensive approach to engage other public

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

CORD114709

A2320

19

1   health partners in this post-approval studies

2   program.

3            In   2005,   the   oversight

4   responsibility was transferred from the Office

5   of Device Evaluation and Office of In Vitro

6   Diagnostics that historically handled the

7   post-approval studies to the Office of

8   Surveillance and Biometrics.  And all the

9   post-approval studies review functions were

10  integrated into the medical device

11  epidemiology and surveillance program within

12  the OSB.

13           We developed an electronic tracking

14  system for post-approval study commitments.

15  This system represents CDRH commitment and

16  determination to ensure that all post-market

17  commitments are fulfilled.

18           This system is based on the

19  post-approval study time lines incorporated

20  into study protocols and agreed upon by the

21  sponsor at the time of the approval.  So all

22  the reporting requirements can convey to the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

CORD114710

A2321

1  sponsor -- and this is based on those

2  deadlines -- the due date and the tracking

3  systems are built.

4         Over the last two years, the

5  epidemiology staff had been gradually

6  integrated into PMA review teams. To advance

7  the least burdensome approach, the

8  epidemiology staff has committed significant

9  resources towards early dialogue with

10  manufacturers to give early input regarding

11  our expectations on post-approval studies and

12  also to help the sponsors by working

13  interactively with them to develop

14  well-designed post-approval studies during the

15  pre-market phase.

16         Our gaol is to finalize by the time

17  of the approval at least an outline of the

18  post-approval study protocol. And very often

19  we finalize the full study protocol at the

20  time of the device approval. We also agree at

21  that time on the study time lines. And, as I

22  said, those study time lines are built into

CORD114711

A2322

21

1   the tracking system.

2          If the advisory panel is convened

3   for that device, then the epidemiologists are

4   part of the FDA presentation team.  So we will

5   hear a little bit about the post-approval

6   studies and our assessment and what

7   post-market considerations for post-approval

8   study are.  These are the pre-market changes

9   that had occurred during the last couple of

10  years.

11         As far as the post-market review

12  practice and upon the device approval, the

13  epidemiologist assumed the lead responsibility

14  in the review of the interim and final

15  reports, again the function that was

16  historically residing in the Office of Device

17  Evaluation.  However, we keep the PMA review

18  team informed and engaged.  And although we

19  serve as the lead reviewers on those

20  submissions, we make sure that the information

21  is being fed back to the pre-market.

22         The concept of epidemiology lead

CORD114712
A2323

22

1   and   the   post-market   team   availability   is

2   envisioned   to   couple   the   epidemiologic

3   expertise   in   observational   studies   of   the

4   Office of Surveillance and Biometrics with the

5   product-specific   technical   expertise   from

6   pre-market   and   post-market   experts   to

7   facilitate knowledge sharing within the CDRH.

8            As   I   had   mentioned,   the   CDRH   had

9   issued   post-approval   studies   guidance

10   documents   late   last   year.    And   we   did   one

11   minor revision in August of this year.

12            In   addition   to   our   internal

13   tracking   system,   the   CDRH   had   also   launched

14   the  publicly  available  Web  site  with  general

15   information  on  all  post-approval  studies  that

16   were   initiated   post-2005,   when   the   OSB

17   received a lead in oversight responsibilities.

18   And this link on the slide is a link to that.

19   I hope that some of you may already have seen

20   the information that we proudly present to the

21   public.

22            I  am  not  going  to  go  into  a  lot  of

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

CORD114713

A2324

23

1    detail about this study, the definitions, but

2    just to illustrate that we have clear

3    objective criteria by which we evaluate the

4    reporting status of post-market commitments.

5          And these are our reporting status

6    definitions that are available on the Web site

7    and also in our guidance document.  These are

8    also the study status definitions that range

9    from protocol-pending to protocol-overdue,

10   study-pending, study-on-time, overdue,

11   terminated, or completed.

12         We generally give the sponsor six

13   months to finalize the protocol unless the

14   protocol is approved at the time of the

15   approval, after which we will mark the

16   protocol overdue on the Web site.

17         We certainly view this -- and this

18   is how it looks like.  These are some of the

19   elements that are available on the Web.  And,

20   as you can see, there is the information about

21   the PMA number, applicant's name, device name.

22         We recently added the category of

CORD114714

A2325

1    the  medical  specialty  and  also  the  date  the

2    PMA  approval  is  there.   We  extract  directly

3    from  the  approval  order  the  brief  description

4    of  the  post-approval  study  protocol.   And  also

5    we  make  sure  that  the  public  knows  when  the

6    protocol  was  approved.

7              And  then  the  final  category  is

8    defined  as  a  study  status  where  we  mark  how

9    well  the  sponsor  has  complied  with  the

10   reporting  requirements  and  how  well  the  study

11   is  progressing.

12             We  certainly  view  this  as  an

13   opportunity,  not  only  for  this  Web  site  to

14   serve  as  an  incentive  for  the  sponsors  to

15   comply  with  their  post-market  study

16   commitments  but  also  our  opportunity  to

17   celebrate  and  to  advertise  the  best  practices

18   of  the  sponsors  in  their  reporting

19   requirements  and  the  progress  of  the

20   post-approval  studies.

21             And,  again,  this  is  another

22   important  initiative  that  we  started  earlier

CORD114715

A2326

1    this year.  We instituted two types of panel

2    updates.  One is going to be the general

3    post-approval studies update that we just

4    started presenting today.

5              This is the very first session that

6    we are presenting this, but we also have the

7    specific post-approval studies update that we

8    started in January when we invited the sponsor

9    of a specific medical device and had the

10   opportunity to present to the panel the

11   progress of their post-approval study followed

12   by the update presentation.  And we have some

13   discussion time for the panel.  Again, we

14   started with this in January this year.  And

15   we have another panel update on a specific

16   ob/gyn device later this year.

17             And, as I said, the post-approval

18   studies program can be only successful if

19   there is effective partnership between the

20   FDA, industry, and other stakeholders.  And

21   toward that effect, we convened the first

22   workshop on the post-approval studies.  It was

CORD114716

A2327

26

1    co-sponsored by the FDA and Food and Drug Law

2    Institute earlier this year, in May.

3            And we will continue dialogue with

4    all of the stakeholders because we believe

5    that without their support, the program will

6    not be able to transform as quickly as we

7    would like it to be.

8            Now, let's just examine quickly

9    what happened with regard to the

10   cardiovascular studies since 2005. Since

11   2005, there was a total of 21 cardiovascular

12   PMAs and supplements approved with

13   post-approval studies. Since some of the PMAs

14   had more than one post-approval study

15   commitment, there is a total of 27

16   post-approval studies initiated post-2005.

17           I would like also to say that, in

18   addition to these studies, we also received 36

19   other pre-2005 studies that we just assumed

20   the responsibility for in April this year. So

21   we do not have all of the updates on all of

22   them, but I hope that by next year in my

CORD114717

A2328

1    presentation, next presentations, I might be

2    able to share some information about those

3    studies as well.

4            These are just the cardiovascular

5    devices post-approval studies, just a quick

6    overview slide.  Again, you can see that as

7    far as the distribution of the study designs,

8    most of the studies are observational.  And

9    this doesn't come as a surprise since the

10   post-approval study is a distinctive

11   post-market tool to be used to study continued

12   safety and effectiveness of approved medical

13   devices when used in a broader population

14   under longer-term use outside of the highly

15   controlled settings of pre-market clinical

16   trials.

17           And, again, I'm very proud to

18   present this slide that shows that all of our

19   studies and all of our sponsors are compliant

20   with regard to the reporting status.  You can

21   see that five studies already for which we

22   received the final report.  There are 18

CORD114718

A2329

1    studies for which we received the report on

2    time.  And for the remaining four studies, a

3    report was received after the due date, but we

4    have it in house.  And we mark it "Overdue.

5    Received" on our Web site.

6              As far as the progress of the

7    studies, again, the vast majority of the

8    studies are on time.  We have some studies

9    that are completed, as you can see.  And also

10   there are protocol-pending studies, mostly

11   those that were approved in 2007, for which we

12   did not finalize the post-approval study

13   protocol yet.  And there are also some

14   study-pending, which means that protocol was

15   approved but the study had not been initiated

16   yet.

17             As far as how we present to the

18   panel, really, this slide clearly shows that

19   since 2005, there has been an increased number

20   of post-approval studies presentations to the

21   panel.  I'm talking here about pre-market

22   panel presentations that range from one out of

CORD114719

A2330