# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC.,<br><br>     Plaintiffs,<br><br>     v.<br><br>JOHNSON & JOHNSON, INC. and<br>CORDIS CORPORATION,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REDACTED – PUBLIC VERSION**

Civil Action No. 07-333-SLR
Civil Action No. 07-348-SLR
Civil Action No. 07-409-SLR

---

## BSC'S REPLY BRIEF IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '7286, '3286,
## AND '473 PATENTS-IN-SUIT PURSUANT TO 35 U.S.C. § 103

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004
(212) 425-7200

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren ((#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6600

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

Dated: October 16, 2009
Redacted Version: October 27, 2009

054604.1003

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

    A.    Cordis Does Not Dispute The Material Teachings Of The Asserted Prior Art ...... 4

    B.    The Asserted Prior Art Does Not "Teach Away" From The Claimed
        Combinations ................................................................................................ 6

    C.    The Alleged Indicia Of Non-Obviousness Do Not Preclude Summary Judgment 11

        1.    There Is No Nexus Between Cypher's "Commercial Success" And The
            Invention Of The Asserted Claims .......................................................... 11

        2.    There Was No Long-Felt Need For The Alleged Inventions Of The 1997
            Patents ................................................................................................ 13

        3.    There Were No Unexpected Results Achieved By The Alleged Inventions
            Of The 1997 Patents ............................................................................ 15

        4.    There Was No Industry Acclaim Relevant To The Asserted Claims Of The
            1997 Patents ....................................................................................... 16

        5.    Any Alleged Failure Of Others Is Not Sufficient To Overcome The
            Overwhelming Evidence Of Obviousness ............................................... 16

        6.    There Is No Adoption By Others/Copying .............................................. 17

CONCLUSION ................................................................................................................ 18

DB01:2747992.1
054604.1003

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Las. v. Andrx Pharms.*,
   452 F.3d 1331 (Fed. Cir. 2006)..................................................................5

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006)..................................................................5

*Andersen Corp. v. Pella Corp.*,
   300 Fed. Appx. 893 (Fed. Cir. 2008).........................................................8

*Atlas Powder Co. v. Ireco, Inc.*,
   190 F.3d 1342 (Fed. Cir. 1999)..................................................................3

*Boston Scientific SciMed, Inc. v. Cordis Corp.*,
   554 F.3d 982 (Fed. Cir. 2009)...........................................................16, 17

*Callaway Golf Co. v. Acushnet Co.*,
   576 F.3d 1331 (Fed. Cir. 2009)..............................................................1, 2

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009)..................................................................8

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
   106 F.3d 1563 (Fed. Cir. 1997)................................................................11

*In re Kubin*,
   561 F.3d 1351 (Fed. Cir. 2009)................................................................10

*Merck & Co. v. Biocraft Labs., Inc.*,
   874 F.2d 804 (Fed. Cir. 1989)....................................................................8

*Ortho-McNeil v. Teva*,
   Nos. 2008-1549, 2008-1550, 2009 WL 2604919 (Fed. Cir. Aug. 26, 2009).....................8

*Procter & Gamble Co. v. Teva Pharma. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009)..................................................................14

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)................................................................11

      

**Statutes**

35 U.S.C. § 103.................................................................................................................... 1, 6, 12

35 U.S.C. § 112........................................................................................................................ 3, 6

DB01:2747992.1

054604.1003

Plaintiffs Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively,

"BSC") respectfully submit this reply brief in support of their motion for summary judgment of

invalidity of the '7286, '3286, and '473 patents-in-suit (the "1997 patents") under 35 U.S.C. §

103.

## INTRODUCTION

In its opposition to this motion, Cordis fails to dispute the following material facts

established in BSC's opening brief:

- The Berg prior art patent discloses every feature of the asserted claims—including drug-eluting stents designed to deliver an anti-restenotic agent from a nonerodible polymeric material in a controlled manner for the treatment or prevention of neointimal proliferation and restenosis—except the use of rapamycin or a macrocyclic lactone analog of rapamycin. (Opening Brief at 24 (D.I. 262)).[1]

- The Morris prior art patent discloses that rapamycin is an anti-restenotic therapeutic agent that can be administered by a vascular stent. (*Id.* at 13–14).

These undisputed facts compel the conclusion that one of ordinary skill in the art would

have been motivated to combine the teachings of Berg and Morris, thereby satisfying every

element of the asserted claims and rendering those claims invalid as obvious under § 103 as a

matter of law. Indeed, all of Cordis's asserted claims presently stand rejected for obviousness in

an *inter parte* reexamination proceeding before the United States Patent and Trademark Office

("PTO").[2] The question of obviousness is one of law, and appropriate for summary judgment.

---

[1]    The D.I. numbers provided in this brief refer to documents filed in connection with Civil Action No. 07-333-SLR.

[2]    Notwithstanding Cordis's citation to *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331 (Fed. Cir. 2009) (Opposition Brief at 39-40), which addressed the introduction of evidence of reexaminations at trial, the rejection of the claims for obviousness by the PTO—leading to the (continued...)

Cordis's contention that the Berg patent "teaches away" from the use of nonerodible polymers is incorrect.  Although Berg expresses a preference for biodegradable polymers, under particular circumstances, it also claims nonerodible polymers and unambiguously states that nonerodible polymers are appropriate when a particular rate of release is desired.  Berg cannot be deemed to "teach away" from the nonerodible polymers that it actually claims.  Moreover, the law is clear that the mere expression of a preference in the prior art does not "teach away" from the less preferred embodiment.

In the face of the overwhelming case of obviousness established by BSC, Cordis's assertions regarding "secondary considerations" tending to show non-obviousness are insufficient to create an issue of fact precluding summary judgment.  *First*, Cordis's previous representations to this Court that the success of its Cypher stent had nothing to do with any coating or coating polymer preclude its current attempts to attribute Cypher's success to the combination of the drug rapamycin (sirolimus) and the nonerodible polymers effecting the controlled release of the therapeutic agent.  *Second*, the Cypher stent cannot be deemed to have solved any long-felt but unmet need because, if the test is whether Cypher reads on the claims of a drug-eluting stent patent (as Cordis undertakes), then the prior art Ding patent (U.S. Patent No. 5,120,536), which Cypher was found to infringe, must already have solved that need.  Moreover, Cordis conveniently ignores the contemporaneous development of BSC's Taxus, which has enjoyed more commercial success than Cypher and no less "solved" any restenosis problem than did Cypher.  *Third*, there are no legally relevant "unexpected results" engendered by the claims of the 1997 patents, since those claims do not recite any clinical results.

---

cancellation or amendment of the claims at issue—is part of the prosecution history of the patents-in-suit and thus relevant to the obviousness inquiry.

The asserted prior art teaches one to make the claimed subject matter of the 1997 patents. But to the extent the Court gives any credence to Cordis's criticism of the prior art, it must be noted that the 1997 patents are as detailed in their disclosure as the prior art, and in many regards, contain even less information than the prior art (such as the omission of exemplified rapamycin-eluting polymeric-coated stents actually made and tested).

Throughout its opposition brief (D.I. 315), Cordis erroneously contends that BSC relies on "attorney argument." In fact, the evidence on which BSC relies—admissions by Cordis's own witnesses and experts, prior Cordis statements from other drug-eluting stent litigations, and documents produced in this case—is far more probative than the self-serving declarations of its own experts proffered by Cordis.

The Court is reminded that BSC is also asserting, in a separate motion, that the claims of the 1997 patent are invalid for failing the enablement requirement under 35 U.S.C. § 112, because the respective specifications do not teach the ordinarily skilled artisan how to make and use the full scope of the claimed subject matter, which extends not only to rapamycin, but to *any* macrocyclic lactone analog of rapamycin. (BSC's Opening Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent Nos. 7,217,286, 7,223,286, 7,229,473, and 7,300,662 Under 35 U.S.C. § 112 (D.I. 257)). This is not inconsistent with the obviousness position set forth herein, because the asserted claims of the 1997 patents are rendered obvious by the prior art's teachings with respect to rapamycin or at least one macrocyclic lactone analog. The principal is that the prior art's species renders the later-claimed genus invalid. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999).

Exhibiting the hallmark of a desperate plaintiff, Cordis insists there are genuine issues of material fact in dispute, pointing to its experts' declarations and other questionable evidence to

suggest issues of fact where there really are none. Accordingly, BSC is entitled to summary

judgment that the 1997 patents are invalid for obviousness.

## ARGUMENT

### A.    Cordis Does Not Dispute The Material Teachings Of The Asserted Prior Art

Cordis does not and cannot dispute the following facts:

- The Berg patent discloses every feature of the asserted claims, including all of the polymers specifically recited in the asserted claims of the '7286, '473 and '3286 patents, except the use of rapamycin or a macrocyclic lactone analog of rapamycin (Opening Brief at 11–13, 24);[3]

- The Berg patent discloses that the therapeutic agent appropriate for its invention is "any therapeutic substance which possesses desirable characteristics for application to a blood vessel" (*id.* at 12–13);

- The Morris patent discloses that rapamycin can be administered by a "vascular stent impregnated with rapamycin" for the treatment of restenosis (*id.* at 13–14);

- The Skotnicki patent discloses that rapamycin analogs can be administered for the treatment of restenosis (*id.* at 14–15);

- The Berg, Morris, and Skotnicki patents all address the treatment or prevention of restenosis (*id.* at 11, 13–15);[4] and

- One of ordinary skill in the art in 1997 would have known how to accomplish controlled release of a therapeutic agent from a polymeric material on a stent (*id.* at 12).[5]



DB01:2747992.1

054604.1003

These undisputed facts lead inexorably to the conclusion that the asserted claims of the 1997 patents are invalid as obvious.  Although Berg exemplifies stents using dexamethasone and does not expressly disclose rapamycin, Berg conveys to the ordinarily skilled artisan how to make a drug-eluting stent for any anti-restenotic agent.  Morris, in complimentary fashion, reports to the artisan that rapamycin is an anti-restenotic agent and can be delivered—among other possible routes of administration, both systemic and local—from a stent.  It is irrelevant that Morris discloses other possible routes of administration, both systemic and local.  What matters is that Morris indisputably discloses that rapamycin is an anti-restenotic agent.  The common objective of Morris and Berg to combat restenosis is sufficient to motivate the ordinarily skilled artisan to combine them by employing rapamycin as the anti-restenotic agent in the Berg drug-eluting stent.  In the same fashion, an ordinarily skilled artisan would have been motivated to employ a macrocyclic lactone analog of rapamycin from Skotnicki in the Berg drug-eluting stent.  Indeed, Cordis does not and cannot distinguish *Alza Corp. v. Mylan Laboratories, Inc.*, 464 F.3d 1286 (Fed. Cir. 2006) and *Abbott Laboratories v. Andrx Pharmaceuticals*, 452 F.3d 1331 (Fed. Cir. 2006), on which BSC relies to show that, in the face of this unimpeachable combination of prior art, the asserted claims of the 1997 patents are invalid as obvious.

Cordis's attempt to raise an issue of fact concerning the reasonable expectation of success that the ordinarily skilled artisan would have in combining the teachings of Berg and Morris is not persuasive.  (*See* Opposition Brief at 35–36).  It is undisputed that the 1997 patent specifications contain the same drug and polymers found in the prior art, and that those materials are applied to the stent in the same way taught by the art.  The 1997 patents contain no testing or experimental data to suggest any unexpected result, thus confirming that the claimed

-5-

combinations are simply consistent with the prior art's teachings.  If there was no reasonable

expectation that rapamycin could be released from a polymeric-coated stent to accomplish its

intended purpose of inhibiting neointimal proliferation, then the 1997 patent specifications have

not enabled the claimed subject matter under 35 U.S.C. § 112 since they lack any exemplified

stent or testing data.  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

## B.    The Asserted Prior Art Does Not "Teach Away" From The Claimed Combinations

In support of its argument that the Berg patent "teaches away" from the use of biostable

(nonerodible) polymers, Cordis posits no credible evidence that Berg discourages or disparages

the use of biostable polymers on a drug-eluting stent.  Indeed, not only does the Berg patent

expressly provide for the use of biostable polymers in the disclosed invention, the patent actually

claims them as well.  (*See* Berg patent, claims 1, 5, and 6 ("A method according to claim 1,

wherein the polymer is a biostable polymer." (claim 5)) (Exh. 12 at BSC-SJA-0627)).  The

relevant passage in Berg unambiguously confirms that biostable polymers are acceptable for use

on the drug-eluting stents disclosed:

> The polymer chosen must be a polymer that is biocompatible and
> minimizes irritation to the vessel wall when the stent is implanted.  ***The
> polymer may be either a biostable or a bioabsorbable polymer***

---

[6]    Exhibits 1 through 116 refer to exhibits attached to the Appendix in Support of BSC's
Motions for Summary Judgment of Non-Infringement and Invalidity Pursuant to 35 U.S.C. § 103
(D.I. 263, 264).  Exhibits 117 through 131 refer to exhibits attached to the Supplemental
Appendix in Further Support of BSC's Motions for Summary Judgment of Non-Infringement
and Invalidity Pursuant to 35 U.S.C. § 103, which were filed concurrently with this brief.

> ***depending on the desired rate of release or the desired degree of
> polymer stability***, but a bioabsorbable polymer is probably more
> desirable since, unlike a biostable polymer, it will not be present long
> after implantation to cause any adverse, chronic local response.
> Bioabsorbable polymers that could be used include poly(L-lactic acid),
> polycaprolactone . . . polyalkylene oxalates, polyphosphazenes and
> biomolecules such as fibrin, fibrinogen, cellulose, starch, collagen and
> hyaluronic acid. ***Also, biostable polymers with a relatively low
> chronic tissue response such as polyurethanes, silicones, and
> polyesters could be used*** and other polymers could also be used if they
> can be dissolved and cured or polymerized on the stent such as
> polyolefins, polyisobutylene and ethylene-alphaolefin copolymers; . . .
> cellulose ethers; and carboxymethyl cellulose.

(Berg patent at col. 4, l. 35–col. 5, l. 7 (emphasis added) (Exh. 12 at BSC-SJA-0625–26)).

In light of the clear language in Berg, the self-serving declarations of Cordis's paid experts cannot create a fact issue as to the question of "teaching away." Berg cannot rationally be deemed to discourage the ordinarily skilled artisan from using biostable polymers when it explicitly states that "the polymer *may be either* a biostable or a bioabsorbable polymer" (emphasis added), then proceeds to recite the biostable polymers that "could be used." (*Id.* at col. 4, l. 35–col. 5, l. 7 (Exh. 12 at BSC-SJA-0625–26)). ██████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

DB01:2747992.1                                                                                              054604.1003

At most, Berg expresses a mere preference for bioabsorbable over biostable polymeric materials under certain circumstances. A mere preference for one embodiment, however, does not "teach away" from another. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009); *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989). Cordis's cases do not hold otherwise. *Ortho-McNeil v. Teva*, Nos. 2008-1549, 2008-1550, 2009 WL 2604919 (Fed. Cir. Aug. 26, 2009) involved a prior art patent that "disparaged" the claimed invention—an invention that was further "disfavored" in the art at the time. Similarly, *Andersen Corp. v. Pella Corp.*, 300 Fed. Appx. 893 (Fed. Cir. 2008) involved prior art patents that specifically taught that a prior art commercially available material possessed many characteristics undesirable for use in the claimed invention. In other words, the prior art in these cases, like the prior art at issue in *Depuy Spine*, "criticized, discredited or otherwise discouraged" investigation into the invention claimed. Indeed, the prior art in *Depuy Spine* specifically expressed concerns regarding the ***failure*** of the claimed invention. Such is not the case with Berg, which merely expresses a preference for bioabsorbable polymers, and, in doing so, does not discourage one of skill in the art from following the path set out in the 1997 patents.

To create a concern about whether Berg "teaches away" from the use of biostable polymers, Cordis turns to other references to make the point that Berg does not. (*See* Opposition Brief at 9–10). However, these other references do not teach away from the use of biostable polymers *per se* and would not discourage the ordinarily skilled artisan from employing any biostable polymer. For example, although the van der Giessen article cited by Cordis (Opposition Brief at 10) discloses that some polymeric materials caused inflammation after implantation, the authors of that article stated that their results were contrary to those of other researchers, were only applicable to the specific polymeric materials tested, and that the results

-8-

they witnessed may have been the result of their experimental methods, such as not sterilizing the implants before implantation.  (Willem J. van der Giessen, M.D., Ph.D. et al., *Market Inflammatory Sequelae to Implantation of Biodegradable and Nonbiodegradable Polymers in Porcine Coronary Arteries*, Circulation, 94:1690–97 (1996) (Exh. 27 at BSC-SJA-0876–83); █

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████  Moreover, some of the very same polymers disclosed in the van der Giessen article are also disclosed in the 1997 patents, but the inventors of the 1997 patents did not disclose how the results they supposedly achieved differed from those achieved by others, such as Dr. van der Giessen and his colleagues.  ███████████████████

█████████████████████████████  Thus, Cordis's reliance on the van der Giessen article and like references is a red herring.

Cordis's attempt to raise the issue of "skepticism" to attack BSC's showing of obviousness (*See* Opposition Brief at 26) is also unavailing.  No "skepticism" can be drawn from a reference that unequivocally provides for biostable polymers on a drug-eluting stent, especially in view of other prior art confirming, in consistent fashion, the use of nonerodible polymers on implantable medical devices.  (*See* Opening Brief at 28).  Nor does Cordis's attempt to characterize the prior art as demonstrating some sort of "skepticism" towards drug-eluting stents in general (Opposition Brief at 9–10), dampen the persuasiveness of the Berg-Morris combination.  The hundreds of prior art references cited on the face of the 1997 patents evincing the glut of drug-eluting stent art belie any notion that ordinarily skilled artisans in 1997 doubted

the viability of these devices.[7]  Moreover, the specification of the 1997 patents confirms the

well-known viability of polymer-coated stents by providing that "[t]he *conventional* approach

has been to incorporate the therapeutic agent into a *polymer material* which is then coated on the

stent." ('7286 patent at col. 3, ll. 48–50 (Exh. 1 at BSC-SJA-0016)).

Cordis also argues that the prior art, including the Berg patent, disclose "laundry lists" of

possible drugs and polymers.  This argument is without merit.  Although the Berg patent

discloses a list of possible therapeutic agents for use in a drug-eluting stent, all of the agents are

directed to providing therapeutic benefit to a blood vessel following coronary angioplasty—the

same use for which Morris discloses the use of rapamycin.  Berg's disclosure of a list of suitable

polymeric materials is also of no import.  For example, the 1997 patents also contain lists of

suitable polymers, and the patentee cannot criticize the prior art if its own disclosure has the

same deficiency.  *In re Kubin*, 561 F.3d 1351, 1356 (Fed. Cir. 2009).[8]  Moreover, an ordinarily

skilled artisan would have been motivated to select fluorinated polymers and acrylate-based

polymers and copolymers from the lists because of their well-known suitability for use in

implantable medical devices. ███████████████████████████

Because Berg does not teach away from the claimed combinations, the asserted claims of

the 1997 patents are invalid as obvious in light of Berg and Morris and as set forth below,

---

[7]    It should also be noted that many of the prior art references (e.g., the Berg patent) provide
a much more detailed discussion of polymeric-coated drug-eluting stents, thereby evidencing the
conventional and well-known nature of such devices.

[8]    The lists of polymers in the 1997 specification contains no preference for either
biodegradable or biostable polymers. ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ Thus,
Cordis cannot explain why the Berg polymer list is any more of a "laundry list" than the listing
set forth in the 1997 specification.

Cordis's reliance on any objective indicia of nonobviousness is not strong enough to overcome the *prima facie* case of obviousness, or preclude summary judgment thereof.

**C.     The Alleged Indicia Of Non-Obviousness Do Not Preclude Summary Judgment**

Cordis's reliance on alleged "secondary considerations" of non-obviousness is insufficient to create triable issues of material fact.

**1.     There Is No Nexus Between Cypher's "Commercial Success" And The Invention Of The Asserted Claims**

Cypher's commercial success is irrelevant to the non-obviousness of the asserted claims of the 1997 patents.  For commercial success to be a relevant consideration, there must be a nexus between the asserted embodiment and the patent claims.  *See, e.g.*, *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999); *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  Here, Cordis has not established a legally cognizable nexus between Cypher's success and the asserted claims.  Specifically, Cordis's attempt to attribute Cypher's success to the combination of rapamycin and nonerodible polymers on a stent to achieve controlled release (Opposition Brief at 2) is fatally undermined by prior positions that Cordis has taken on the same issue.  Specifically, in the Ding case, where it served Cordis's interests to argue that Cypher's success had nothing whatsoever to do with its coating, Cordis represented to the Court that "Cypher's success is attributable to sirolimus and Dr. Palmaz's [prior art stent] design, *not its use of the polymer coatings taught in the prior art*."  (9/12/03 Cordis Prelim. Inj. Post-Hearing Brief in C. A. No. 03-283-SLR (D. Del.)), at 35 (emphasis added) (Exh. 121 at BSC-SJA-2269)).  Similarly, Cordis's expert testified at trial:

> Q:     . . . [D]oes the Cypher – does the success of the Cypher stent have anything to do with the Ding [drug-in-polymer coated stent] invention?

A:    In fact, it does not.  **The success of the Cypher stent, and this is the point I would like to strongly make, has everything to with the drug Siorolimus.**

Q:    I'm sorry?

A:    I was going to say, this is the key to success.  This was the key that I think we were all waiting for.  **The membrane technology was available.  It was standard application with known technologies.  I think the breakthrough was the use of the drug Sirolimus [i.e., rapamycin].**

(6/30/05 Ding Trial Tr. at 1579:13–24 (C. A. No. 03-283-SLR (D. Del.)) (testimony of Cordis expert Dr. Hanson) (emphasis added) (Exh. 122 at BSC-SJA-2272)).

Cordis's duplicity in now asserting that the coating polymers are contributing to the commercial success cannot be excused by Cordis's contention that "the claimed inventions of the 1997 patents are completely different from the Ding patent."  (Opposition Brief at 39).  Precisely the same question was posed in both cases:  *What features of the Cypher stent attributes to its commercial success?*  Cordis has already made clear that the Cypher coating made no such contribution.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████  Cordis also attributes Cypher's commercial success to a zero restenosis rate (*see* Defendants/Counter-Plaintiffs Response to BSC's Motion for Summary Judgment of Invalidity of the '662 Patent Pursuant to 35 U.S.C. § 103 at 25 (D.I. 306 in C. A. No. 07-765-SLR, "'662 Opposition Brief")), but the claims of the 1997 patent disclose no such clinical results.  Thus, Cordis cannot establish a nexus between the asserted patent claims and the Cypher stent.

### 2.   There Was No Long-Felt Need For The Alleged Inventions Of The 1997 Patents

Turning to another objective consideration, Cordis asserts that Cypher solved a long-felt but unmet need, which Cordis contends is relevant to the obviousness inquiry because Cypher reads on claims of the 1997 patents.  As the Court well knows, however, Cypher has already been found to read on the drug-eluting stent claims of the prior art Ding patent (U.S. Patent No. 6,120,536).  Thus, by Cordis's reasoning, the long-felt need had already been met by the Ding patent before the 1997 patents.

In addition, the fact that BSC's Taxus was developed contemporaneously with Cypher and was approved shortly after Cypher in early 2004 undercuts Cordis's assertion that Cypher solved the long-felt need for treating restenosis.  ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  Thus, Taxus and brachytheraphy solved any long-felt need at about the same time as Cypher or before Cypher.[9]

Cordis's argument regarding long-felt need is further muddled by Cordis's contention that its later patent, the '662 patent, actually solved the problem of restenosis, leaving in doubt whether the invention claimed in the earlier 1997 patents solved any problem at all.  (*See* '662 Opposition Brief at 24–26).

In any event, Cypher's 2003 entrance into the marketplace is not even relevant to the "long-felt need" inquiry.  The relevant inquiry is whether the 1997 patent specifications enabled or disclosed the Cypher stent and whether any other prior art disclosed a solution to the problem

---

████████████████████████████████████████████████████████████████

DB01:2747992.1

054604.1003

of restenosis.  In *Procter & Gamble Co. v. Teva Pharma. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009), the patent-in-suit, which disclosed the compound risedronate, was filed in 1985, but risedronate was not approved for marketing until years later.  Before that approval (but still after the 1985 patent application filing), a competing drug, alendronate, was approved.  Teva, in challenging the patent, argued that risedronate could not have met a long-felt need because alendronate was on the market first and the "long-felt need must be unmet at the time the invention becomes available on the market, when it can actually satisfy that need." *Id.*  The Federal Circuit rejected this logic, holding that "we look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need." *Id.*  In the present case, the analogous inquiry is whether the need for a restenosis treatment was met by the 1997 patent applications or by prior art.  Clearly, the prior art Ding patent, whose claims covered Cypher met that need.  For that matter, the prior art Morris patent also disclosed rapamycin on a stent for treating restenosis.  Thus, any long-felt need was met by at least the prior art Ding and Morris patents long before Cypher entered the market.



054604.1003

### 3.      There Were No Unexpected Results Achieved By The Alleged Inventions Of The 1997 Patents

Another consideration addressed by Cordis is "unexpected results."  Cordis does not dispute that the 1997 patents failed to achieve any "unexpected results."  In fact, Cordis never asserts that there is anything unexpected about rapamycin's ability to elute from a nonerodible polymeric-coated stent and its ability to inhibit neointimal proliferation to some extent.  According to Cordis, however, the 1997 claims require only that some amount of neointimal proliferation be inhibited to accomplish "some efficacy."  (*See* '662 Opposition Brief at 21 ("The claims [of Cordis's '3286 patent] do not require that this inhibition be sufficient for a clinical trial or a commercial product, but merely that it show *some efficacy*." (emphasis added))).[10]  Indeed, based on the prior art's teachings of rapamycin's efficacy, and the well-developed drug-eluting stent art, Cordis cannot argue that there are any unexpected results.  Cordis's assertion that Cypher's measured ***clinical results*** were unexpected (*id.* at 37) is particularly misleading given that clinical results are neither disclosed nor claimed in the 1997 patents.  Indeed, Cordis contends elsewhere that the invention of the '662 patent is the later measurement of clinical results.  (*id.* at 1).  The consideration of Cypher's clinical efficacy, therefore, has no bearing on the nonobviousness of the asserted claims of the 1997 patents.

Cordis also alleges, unpersuasively, that industry acclaim and the failures of others support the non-obviousness of the asserted claims.



### 4. There Was No Industry Acclaim Relevant To The Asserted Claims Of The 1997 Patents

While Cypher achieved some level of industry acclaim when it was approved in 2003—and had the market to itself for a short time (while Taxus was pending FDA approval)—any acclaim for Cypher must be considered against the substantial and immediate impact of Taxus on Cypher's market leadership upon the introduction of Taxus in 2004. █████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████ As such, the industry acclaim Cypher may have enjoyed does not support the non-obviousness of the claims of the 1997 patents or raise a material issue of triable fact on the question of obviousness.

### 5. Any Alleged Failure Of Others Is Not Sufficient To Overcome The Overwhelming Evidence Of Obviousness

Cordis unfairly asserts that prior to the availability of the Cypher stent, the efforts of medical device manufacturers to develop a drug-eluting stent for preventing restenosis ended in failure, including the owners of the prior art Berg patent. (*See* Opposition Brief at 37). This is not a persuasive indicia of non-obviousness. First, Cordis ignores again that the contemporaneously-developed TAXUS stent was not a failed attempt by others to make a drug-eluting stent for the treatment of restenosis. Second, in *Boston Scientific SciMed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009), the Court considered such evidence as Medtronic's failure to develop a drug-eluting stent as a "weak secondary consideration of nonobviousness." The court remarked that Cordis had presented evidence that "the failure of others was due to

difficulty in finding a suitable drug," as opposed to developing a proper coating.  In the present case, however, the prior art made the choice of drug obvious.

### 6.    There Is No Adoption By Others/Copying

Cordis incorrectly asserts that BSC has adopted the technology used in Cypher and claimed in the '662 patent.  (*See* Opposition Brief at 38).  Promus is not an adaptation of Cypher because Promus and Cypher use different underlying metallic stents, Promus uses two polymeric coatings whereas Cypher uses three polymeric coatings (i.e., Cypher uses a top coat top to control drug elution whereas Promus does not), and Promus and Cypher each use different drugs (everolimus versus rapamycin).  ████████████████████████████████████
Also, as explained in Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment of Non-Infringement of the Asserted Claims of the '662 Patent-in-Suit (D.I. 262 in C. A. No. 07-765-SLR), Promus does not read on the asserted claims of the '662 patent.

## CONCLUSION

For the foregoing reasons, BSC respectfully requests that the Court grant its motion for summary judgment of invalidity for obviousness.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Andrew A. Lundgren*
_____
Josy W. Ingersoll (#1088) [jingersoll@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489) [kkeller@ycst.com]
Andrew A. Lundgren (#4429) [alundgren@ycst.com]
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6600

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. DeLucia
Paul M. Richter, Jr.
Michael K. Levy
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: October 16, 2009

DB01:2747992.1                                                                 054604.1003

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on October 27, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire [sbalick@ashby-geddes.com]
> John G. Day, Esquire [jday@ashby-geddes.com]
> Lauren E. Maguire, Esquire [lmaguire@ashby-geddes.com]
> ASHBY & GEDDES
> 500 Delaware Avenue, 8th Floor
> Wilmington, DE 19801

I further certify that on October 27, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> David T. Pritikin, Esquire [dpritikin@sidley.com]
> William H. Baumgartner, Esquire [wbaumgartner@sidley.com]
> Russell E. Cass, Esquire [rcass@sidley.com]
> Jon M. Spanbauer, Esquire [jspanbauer@sidley.com]
> SIDLEY AUSTIN LLP
> One  South Dearborn
> Chicago, IL 60603

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> */s/ Andrew A. Lundgren*
> _____
> Josy W. Ingersoll (No. 1088) [jingersoll@ycst.com]
> Karen L. Pascale (No. 2903) [kpascale@ycst.com]
> Karen E. Keller (No. 4489) [kkeller@ycst.com]
> Andrew A. Lundgren (No. 4429) [alundgren@ycst.com]
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> *Attorneys for Plaintiffs Boston Scientific Corporation*
> *and Boston Scientific Scimed, Inc.*